UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| RENARD TURNER, | ) | Case No.: 1:05 CV 1327 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| GRANDE POINTE HEALTHCARE | ) | |
| COMMUNITY, | ) | |
| | ) | |
| Defendant | ) | ORDER |

On May 16, 2005, Plaintiff Renard Turner ("Plaintiff") filed this action *pro se* against

Defendant Grande Pointe Healthcare Community ("Defendant" or "Grande Point"). (Compl.; ECF

No. 1.) Plaintiff subsequently retained counsel and filed an Amended Complaint on March 11, 2006.

(Am. Compl., ECF No. 31.)  The Amended Complaint alleges the following federal and state law

claims: (1) violation of the Equal Pay Act ("EPA") relating to gender-based pay discrimination under

29 U.S.C. §§ 201-209; (2) reverse gender discrimination relating to unequal pay under O.R.C. §§

4112.02 and 4112.99; and (3) reverse gender discrimination relating to employment opportunities

under O.R.C. §§ 4112.02 and 4112.99.  (Am. Comp. ¶ ¶ 32-36, 20-25, 26-31.)  The Amended

Complaint seeks compensatory, declaratory, and punitive damages, as well as all costs, fees and any

other equitable or monetary relief as justice requires.  Currently pending before the court is

Defendant's Motion for Summary Judgment ("Motion," ECF No. 35) on Plaintiff's federal and state law claims. For the reasons set forth below, the Motion is granted in part and denied in part.

## I.  FACTS

Grande Pointe is a residential care facility providing long-term nursing home, assisted living, and rehabilitative care to its residents. (*See* Aff. of Ms. Missy Schaefer, Grande Point's administrator ("Schaefer Aff.") ¶ 1, ECF No. 35-7.) It is undisputed that the majority of the workforce and management staff at Grande Pointe are female. (Am. Comp. ¶ 12; Def.'s Mot. For Summ. J. at 12, ECF No. 35)

On February 23, 2001, Plaintiff applied for a position with Grande Pointe. (Pl. Dep. at 39, ECF No. 35-14; *see* Pl. Application, ECF No. 35-18.) Plaintiff listed $8.50 - $9.00 per hour as his "minimum salary acceptable" on his job application. (Pl. Dep. at 40; Pl. Application at 1.) In March, 2001, during Plaintiff's interview, Defendant offered Plaintiff a full-time position as an Activities Leader ("AL") in the Nursing Home Department at a pay rate of $8.50 per hour. (*See* Aff. of Ms. Lori Rosenberg, Defendant's Director of Therapeutic Recreation ("Rosenberg Aff.") ¶ 2, ECF No. 35-15; Turner Dep. at 22-23.) Plaintiff states that he asked Defendant if the pay rate could be higher and specifically suggested $10.00 per hour, but Grande Pointe refused. (Turner Dep. at 17, 23.) In contrast, Defendant contends that *no* salary negotiation took place (Rosenberg Aff. ¶ 2), and Plaintiff accepted the position "on the spot." (Turner Dep. at 23.)

On March 11, 2001, Plaintiff signed a "Position Description" delineating the expectations, qualifications, and responsibilities of the AL position. (AL Position Description, ECF No. 35-17.) The Position Description states, in pertinent part:

> The position of Activities Leader provides individualized activity care and services for residents.  This position functions as both a team member within the activities department and an interdisciplinary team member for an assigned unit(s) fostering team success.  While focusing on delivery of quality care, the position must also manage assigned resources.

(*Id*. at 1.)  At the time Plaintiff was hired, there were seventy-eight patients in the Nursing Home Department.  (Turner Dep. at 28; Schaefer Aff. ¶ 12.)  Defendant asserts that Plaintiff was responsible for twenty-nine of those residents.  (Schaefer Aff. ¶ 12; Rosenberg Aff. ¶ 6.)  Plaintiff asserts that he shared responsibility for the seventy-eight patients with only one other AL and that on occasion he acted, and still acts, as AL for the Nursing Home Department, the Assisted Living Unit, and the Skilled Nursing Unit, all at the same time, with no assistance or supervision.  Plaintiff maintains that at these times he is responsible for over 100 residents.  (Turner Decl. ¶¶ 4-5.)

Plaintiff alleges that he is a victim of reverse gender discrimination relating to unequal pay under federal and state laws.  (Compl. ¶¶ 20-25, 32-26.)  Plaintiff presents Ms. Rebecca Jackson[1] ("Jackson") as a female comparator.  (*See, e.g.*, Pl's Opp'n to Def.'s Mot. For Summ. J. at 2 ("Pl.'s Opp'n"), ECF No. 37; *see generally* Turner Decl. ¶¶ 6-9.)  Jackson applied for a position with Grande Pointe on February 12, 2001.  (*See* Jackson Application, ECF No. 35-19.)  On her application, Jackson listed $10.00 per hour as her "minimum salary acceptable."  (*Id.* at 1.)  During her interview, Jackson reiterated that she could not accept a position for less than $10.00 per hour.  (Rosenberg Aff. ¶ 3.)  On or about March 12, 2001, Jackson was offered a full-time position as an

---

[1]    When Ms. Rebecca Jackson applied for a position at Grande Pointe, she listed her name as Rebecca S. Sakatch.  (Jackson Application at 1.)  Currently, she is known by the name Rebecca Jackson.  (Jackson Dep. at 4.)

Activities Coordinator ("AC") in the Assisted Living Department at a pay rate of $10.00 per hour. (Jackson Dep. at 64, 66; Rosenberg Aff. ¶ 3; Schaefer Aff. ¶ 7.)

On March 11, 2001, Jackson signed a "Position Description" delineating the expectations, qualifications, and responsibilities of the AC position. (AC Position Description, ECF No. 35-16.) The Position Description states in pertinent part:

> The position of Activities Coordinator provides individualized activity care services for residents and leadership for activity leaders to assure standards are met and the highest degree of quality are provided at all times. This position functions as both a team member, leader, and supervisor to ensure that work is accomplished and quality care is delivered, supporting team members and leading the way in celebrating team success. While focusing on delivery of quality care, the position must also manage assigned resources.

(*Id*. at 1.) At the time Jackson was hired, she alone was responsible for all forty-five residents in the Assisted Living Department. (Jackson Dep. at 81-82; Rosenberg Aff. ¶ 6; Schaefer Aff. ¶ 13.) (Schaefer Aff. ¶ 22.) One month before Jackson voluntarily resigned from her position at Grande Pointe in 2004, she was transferred to the Magnolia Skilled Unit due to internal restructuring. (Jackson Dep. at 87-88; Schaefer Aff. ¶ 23.) Jackson did not receive an increase in pay due to the transfer. (Jackson Dep. at 89; Schaefer Aff. ¶ 23.)

Additionally, Plaintiff alleges that he is a victim of reverse gender discrimination relating to promotional opportunities under state law. (Am. Comp. ¶ 26-31.) Plaintiff claims that he has been denied promotional opportunities based on his gender on at least three separate occasions.[2] First,

---

[2]     In his deposition, Plaintiff draws attention to two additional promotional opportunities he felt he was denied, however males were eventually hired to fill both of these positions. (Turner Dep. at 125-126, 128-132.) The first was an opening created in 2004 by the resignation of Jackson from the Magnolia Skilled Unit. (Turner Dep. at 125-126.) The second position was with the Central

Plaintiff alleges that he was denied a promotional opportunity in 2003, relating to a position in the Magnolia Skilled Unit.  (Turner Decl. ¶ 10.)  Plaintiff states that he verbally expressed an interest in this promotional opportunity and Defendant told him that no pay increase would accompany the position.  (*Id.*; *see also* Turner Dep. at 114-115.)  Based on this information, Plaintiff decided not to formally apply.[3]  (Turner Dec. ¶ 10.)  The position was later awarded to Margaret Thomas, a female, at a rate of $10.25 per hour.  (*Id.*)  At this time, Plaintiff was paid between $8.80 and $9.24 per hour.  (*Id.*)

Next, Plaintiff alleges that he was denied a promotional opportunity in August, 2005, involving the position of Assistant Activities Director.  (Turner Dep. at 132; Turner Decl. ¶ 12.)  Plaintiff formally applied for this position, as did Ms. Sanita Phillips ("Phillips").  (*See* Aff. of Ms. Rosalind Turnage, Grande Pointe's Activities Director ("Turnage Aff.") ¶ 2, ECF No. 36.)  Turnage conducted the interview on behalf of Grande Pointe.  (*Id.*)  Phillips was awarded the position at a pay rate of $13.00 per hour.  (Pl.'s Decl. at ¶ 13; Turnage Aff. at ¶ 4.)  Turnage hired Phillips because she "behaved professionally, appeared to have taken the interview seriously and successfully completed the computer test."  (Turnage Aff. ¶ 4.)  Plaintiff, in contrast, "behaved in a very unprofessional

---

Supplies and Records Department in 2004.  (Turner Dep. at 128-132.)  Plaintiff has not relied on these two opportunities to further his failure to promote claim, though they are mentioned in his deposition.  (*See generally* Pl.'s Opp'n to Def.'s Mot. For Summ. J.)  As such, this court shall not consider these two positions as support for Plaintiff's claims.

[3]   During his deposition, Plaintiff stated that he "still applied for [the First Magnolia Opportunity] and was refused."  (Turner Dep. at 114-115.)  However, later in his declaration Plaintiff states that he merely "verbally expressed interest" in the position and then later "decided not to fill out any of the formal paperwork required for seeking the promotion."  (Turner Decl. ¶ 10.)

manner."(Turnage Aff. at ¶ 3.)  Turnage stated that Plaintiff "sprawled in the chair and did not appear to take the interview seriously."  (Turnage Aff. ¶ 3.)  Turnage further asserts that Plaintiff said "this job will be easier than what I am doing now."  Turnage then stated that she asked Plaintiff to complete a computer test, and he refused.  (*Id.*)  Plaintiff denies behaving unprofessionally during the interview.  (Turner Decl. at ¶ 12.)  Plaintiff stated that he never slouched in his chair or said that the job would be easier than his current position.  (*Id.*)  Furthermore, he denies ever having been asked to take a computer test.  (*Id.*)

Finally, Plaintiff alleges that he was denied a promotional opportunity in 2006 that involved another position in the Magnolia Skilled Unit.[4]  (Turner Decl. ¶ 11.)  Plaintiff never formally applied for this position, though Plaintiff maintains that he verbally inquired about it to Ms. Susan Kozan ("Kozan"), Defendant's former Activities Director.  (*Id.*)  In his Declaration, Plaintiff stated that Kozan told him that there would be no increase in pay and that he "wasn't prepared for the position anyhow," which discouraged him from formally applying.  (*Id.*)  This position was available for approximately six months and eventually was filled by Mary Fogg, a female.[5]  (Turner Dep. at 117-119.)

On September 27, 2004, Plaintiff filed a charge with the Ohio Civil Rights Commission and Equal Employment Opportunity Commission ("EEOC"), alleging gender-based discrimination

---

[4]     The court notes that while Plaintiff's Opposition and Declaration each refer to this position as being available in 2005 (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 7; Turner Decl. ¶ 11), during Plaintiff's deposition he refers to the position as opening in January or February of 2006.  (Turner Dep. at 117-118.)          The court will refer to the Second Magnolia Opportunity as occurring in 2006.

[5]     Mary Fogg is sometimes referred to as Mary Faug in the record.  (*See, e.g.,* Turner Dep. at 117.)

relating to unequal pay and disparate treatment.  (EEOC Charge, ECF No. 35-2.)  Following an

investigation, the EEOC dismissed the charge, stating that "the EEOC is unable to conclude that the

information obtained establishes violations of the statutes."  (EEOC Charge Dismissal, ECF No. 35-

4.)  On April 25, 2005, Plaintiff asked the EEOC to reconsider his case by interviewing Jackson, and

the EEOC complied with Plaintiff's request.  (Pl.'s Request for EEOC Charge Reconsideration, ECF

No. 35-6; Jackson Dep. at 47-48.)  Defendant maintains that the EEOC affirmed its dismissal decision

(Def. Mot. For Summ. J. at 2).  However, there is nothing on the record to confirm this, nor is there

any information in the record showing that the EEOC reversed its decision.  Plaintiff filed this lawsuit

on May 16, 2005.  (Pl. Compl.)

## II.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine issue
> as to any material fact and that the moving party is entitled to a
> judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for

summary judgment:

> Supporting and opposing affidavits shall be made on personal
> knowledge, shall set forth such facts as would be admissible in
> evidence, and shall show affirmatively that the affiant is competent
> to testify to the  matters stated therein . . . .  The court may permit
> affidavits to be supplemented or opposed by depositions, answers to
> interrogatories, or further affidavits.  When a motion for summary
> judgment is made and supported as provided in this rule, an adverse
> party may not rest upon the mere allegations or denial of the adverse
> party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing

> that there is a genuine issue for trial.  If the adverse party does not so
> respond, summary judgment, if appropriate, shall be entered against
> the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standard. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The

- 8 -

non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

### III.  LAW AND ANALYSIS

### A. Equal Pay Act.

The Equal Pay Act ("EPA") prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work.  29 U.S.C. § 206(d)(1).  To establish a prima facie EPA case, the plaintiff must show that the defendant paid higher wages to employees of the opposite sex "'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)). "Equal work" does not require that the jobs be identical. *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006).  Rather, whether two jobs are substantially equal for the purposes of an EPA claim is "determined on a case-by-case basis and 'resolved by an overall comparison of the work, not its individual segments.'" *Id.* (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir.1981) (orderlies and nurse aides perform substantially similar work)).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to prove that the wage differential is justified under one of the four affirmative defenses delineated by the EPA.  *Corning Glass Works*, 417 U.S. at 196-97; *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir.1998).  These affirmative defenses are: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality production; or (4) any other factor other than sex . . . ."  29 U.S.C. § 206(d)(1).  While the fourth affirmative defense serves as a catch-all

- 9 -

provision, it does not include literally any factor, "but a factor that, at a minimum, was adopted for a legitimate business reason." *E.E.O.C. v. J.C. Penney Co.*, Inc., 843 F.2d 249, 253 (6th Cir. 1988).

If the plaintiff can establish a prima facie case, summary judgment on an EPA claim in the defendant's favor is appropriate "only if the record shows that [the defendant] established the [affirmative] defense so clearly that no rational jury could have found to the contrary." *Buntin*, 134 F.3d at 800 (quoting *Equal Employment Opportunity Comm'n v. Delaware Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1414 (3d Cir.1989)).

<u>1. Plaintiff's Prima Facie Case Under the EPA</u>

Plaintiff alleges that Grande Pointe paid Jackson, a female, higher wages for "equal work."which "'require[d] equal skill, effort, and responsibility, and . . . [were] performed under similar working conditions.'" *Corning Glass Works*, 417 U.S. at 195 (quoting 29 U.S.C. § 206(d)(1)). The court concludes that Plaintiff makes a prima facie EPA claim because a genuine issue of material fact exists regarding whether Johnson is an appropriate female comparator, and the court must construe conflicting evidence in the light most favorable to Plaintiff, the non-moving party.

First, Defendant argues that the position descriptions reveal that Plaintiff's position as AL required different skills than Jackson's position as AC. "Skill," according to the federal regulations, "includes consideration of such factors as experience, training, education, and ability" and "must be measured in terms of the performance requirements of the job." 29 C.F.R. § 1620.15(a). Defendant points out that the AC Position Description states that the AC is to provide "leadership for activity leaders" and that the position "functions as both a team member, leader, and supervisor."

- 10 -

(AC Position Description at 1.)  In contrast, Defendant notes, the AL Position Description is silent as to any leadership or supervisory roles.  (AL Position Description at 1.)  Additionally, the AC Position Description lists more stringent requisite qualifications.  Under the "type[s] of knowledge" qualifications on the respective Position Descriptions, the AL Position Description lists "[b]asic reading, writing and math skills, ability to follow verbal & written directions/instructions."  (*Id.* at 6.)  In contrast, the AC Position Description states that the AC:

> • Must have comprehensive knowledge of Activity Program, Standards of Practice; management, supervision and leadership as well as laws, regulations and guidelines that pertain to long-term care.
> • Must be able to complete required activity documentation in a timely and accurate manner.
> • Must be creative and able to plan, organize, develop, implement and interpret programs, goals, objectives, policies and procedures[,] etc.[,] that are necessary for providing quality care for assigned residents.

(AC Position Description at 5.)

However, the court finds a genuine issue of material fact exists concerning whether the AC and AL positions required different skills based on Plaintiff's statement, borne out of his experience, that the AC and AL performed virtually identical activities, as well as Plaintiff's statement that Jackson did not perform many of the duties listed on the AC Job Description.  The court notes that Defendant is correct in its assertion that the AC job description on its face appears to require more skill than the AL position.  However, when determining whether a comparator is appropriate for the purposes of an EPA claim, the court's focus should be on actual job requirements and duties, rather than job classifications or titles.  *Beck-Wilson*, 441 F.3d at 362.

- 11 -

Plaintiff contends that the AC and AL positions required substantially similar skills based upon the fact that the two positions performed the same duties. (Pl.'s Decl. ¶ 6.) To support this allegation, Plaintiff states that he performed the following activities with the Nursing Home residents in 2006, and that the AC performed these same activities with the Assisted Living residents: 1) music; 2) exercise; 3) bingo; 4) trivia; 5) movie of the Week; 6) pet visits; 7) laughtercise; 8) rosary; 9) live music; 10) worship with Rev. Hale; 11) word scramble; 12) activity snack cart; 13) happy birthday party; 14) social; 15) inspirational sayings; 16) current events; 17) "Step Back in Time"; 18) Catholic mass; and 19) men's lunch. (Turner Decl. ¶ 6, Exs. 6-7, filed manually.)

Plaintiff also contends that the actual AC and AL jobs required similar skills because Jackson did not perform many of the duties listed in the AC Job Description. (Pl. Decl. ¶ 7.) Plaintiff asserts that, since Jackson and Plaintiff frequently worked together in Defendant's Savannah Therapeutic Room, he was "able to personally observe Defendant working many times over a three-year period." (*Id.*) Plaintiff asserts that, "based upon these observations, he is personally aware that many of the duties listed in [the AC job description] are not accurate." (*Id.*) Plaintiff contends that Jackson did not perform any of the following activities and that, Turnage, Jackson's supervisor, performed many of them: 1) reviews triggers, completes RAP, writes RAP Notes, and completes RAP Summary form; 2) develops, reviews/revises activity care plans in coordination with individual residents and interdisciplinary care team members; 3) develops and maintains activity precautions list; 4) provides training for activity leaders on how to complete daily activity daily participation records; 5) audits activity leaders documentation of daily activity daily participation records; 6) writes progress notes; incidental notes, quarterly notes, care conference summary,

- 12 -

discharge notes and discharge summary notes; 7) maintains record of completed documentation as well as dates for future documentation; 8) may assume a temporary leadership role in the department during absence of the Activity Director; 9) provides input into proposed budget, adheres to approved budget, may coordinate/participate in resident fundraising events as assigned; 10) assists in writing reports, letters, memos and electronic communication; 11) monitors programming in the center, outside and in the community; 12) may assist residents with ADL needs, *i.e.*., transfer, toileting, feeding, etc.; 13) may assist with developing, reviewing and/or revising job descriptions; 14) may assist with recruiting and selecting qualified activity professionals; 15) may assist in providing orientation and in services for personnel in other departments; and 16) may provide disciplinary action, as assigned.  (*Id.* at 7) (citing Pl.'s Ex. 8, filed manually).  Based on the evidence presented by Plaintiff, the court finds that  genuine issues of material fact exist regarding whether the AC and AL positions required similar skills.

Second, Defendant argues that Plaintiff's duties as AL of the Nursing Home Department did not require the same effort as Jackson's duties as AC of the Assisted Living Department.  "Effort," according to the federal regulations, "is concerned with the measurement of the physical or mental exertion needed for the performance of a job."  29 C.F.R. § 1620.16(a).  Defendant asserts that Assisted Living residents were generally "more alert, oriented, independent, and [had] a higher cognitive and physical functioning" than the Nursing Home residents.  (Rosenberg Aff. ¶¶ 5-6; Schaefer Aff. ¶ 10; Jackson Dep. at 67-68.)  Therefore, Defendant maintains, Assisted Living residents were "more interactive" and required "more interactive, lengthy and substantive programming than the nursing home residents."  (Schaefer Aff. ¶ 10; Rosenberg Aff. ¶ 6.)  For example, Defendant states that many of the games and activities designed by Jackson for the

Assisted Living residents were interactive and would require a certain level of cognitive functioning that would not have been appropriate for Nursing Home residents. (*See* Jackson Dep. at 72.)

Plaintiff, however, contends that the AC and AL positions required the same effort because the Nursing Home clients were functionally similar to the Assisted Living clients. Specifically, Plaintiff alleges that many of the Nursing Home residents were "simply former residents of [Defendant's] Assisted Living unit who transferred to his department because they no longer were able to afford to continue living in the more expensive Assisted Living area." (Pl. Decl. ¶ 8.) Therefore, Plaintiff asserts, "[m]any of them were as physically and mentally healthy and functional as residents of the Assisted Living unit." (*Id.*) Plaintiff alleges that he "personally witnessed [Defendant] transfer dozens of healthy, fully functional Assisted Living residents to the Nursing Home department once they became Medicare and/or Medicaid patients." (*Id.*) Based on these statements, the court finds that genuine issues of material fact exist regarding whether the AC and AL positions required similar effort.

Finally, Defendant argues that Plaintiff's duties as AL of the Nursing Home Department did not require the same level of responsibility as Jackson's duties as AC of the Assisted Living Department. "Responsibility," according to the federal regulations, "is concerned with the degree of accountability required in the performance of the job[.]" 29 C.F.R. § 1620.17(a). Defendant states that Jackson's position as AC of the Assisted Living Department had "more autonomy and less supervisory oversight" in the "planning and implementation of her programs, communications with residents, and her communications with families" than Plaintiff's position. (Rosenberg Aff. ¶ 6.) Additionally, Defendant contends that, while Jackson was solely responsible for all forty-five residents in the Assisted Living Department, Plaintiff shared responsibility for seventy-eight

- 14 -

residents in the Nursing Home Department with at least one other AL.  (Jackson Dep. at 81-82; Rosenberg Aff. ¶ 6; Schaefer Aff. ¶ 13; Turner Decl. ¶ 4.)  It is uncontested that Jackson was the only AC employed in the Assisted Living Department. In contrast, Defendant states that Plaintiff could rely on the Supervisor, Assistant Supervisor and other AL(s) assigned to the Nursing Home Department for assistance.  (Rosenberg Aff. ¶ 6; Schaefer Aff. ¶ 11.)

However, Plaintiff maintains in his Declaration that Jackson in her role as AC did not have more responsibility than Plaintiff did in his role as AL.  Plaintiff states that "like Jackson, I  had a great deal of autonomy in planning and implementing events in [my] area and was not subject to 'significant supervisory oversight' in that area or in the areas of conducting residents' activities, communicating with residents' families, and developing resident care plans."  (Pl.'s Decl. ¶  9.) Plaintiff also alleges that during numerous weekends and on every Sunday, he served as AL for *all* residents in the Nursing Home Department, the Assisted Living Department and the Skilled Nursing Unit without assistance, meaning that [I] was responsible for well over 100 residents.  (*Id.* ¶ 5.) Based on the evidence presented by Plaintiff, the court finds there is a genuine issue of material fact regarding whether the AC and AL positions required similar responsibility.

As the movant for summary judgment, Defendant failed to show that a reasonable juror could not find that Plaintiff established his prima facie case.  Viewing the evidence in the light most favorable to Plaintiff, reasonable jurors could find that AL and AC positions are substantially equal.  Therefore, Plaintiff has identified an appropriate female comparator.  Accordingly, the court concludes that Plaintiff makes a prima facie EPA claim.

<u>2. Defendant's Affirmative Defenses</u>

- 15 -

However, Plaintiff's EPA claim fails because Defendant can prove an affirmative defense that the wage differential at issue was due to a "factor other than sex."  Defendant offers the following gender-neutral, legitimate business reasons for the wage differential: (1) Defendant's interest in controlling attrition in the Assisted Living Department by increasing the starting salary of the AC; and (2) the job candidates' respective salary histories, demands and willingness to negotiate.  (Schaefer Aff. ¶ 9; Rosenberg Aff. ¶ 4; Def.'s Reply at 7-9.) The court finds that, for the following reasons, Defendant met its burden of proof on its first affirmative defense but did not meet its burden of proof on the second affirmative defense.

In the Sixth Circuit, to qualify as a "factor other than sex" for the purposes of establishing an affirmative defense to an EPA claim, the factor must have been, "at a minimum, . . . adopted for a legitimate business reason."  *J.C. Penney Co., Inc.*, 843 F.2d at 253.  Increasing pay rates to combat attrition is a legitimate business reason.  *See, e.g., Beck-Wilson,* 441 F.3d at 368-69 (finding that an increase in pay in order to avoid retention problems was a legitimate business factor).

First, in support of its affirmative defense that Defendant's interest in controlling attrition in the Assisted Living Department was a reason to increase the starting salary of the AC, Defendant submitted a supplemental affidavit detailing the employment dates and salaries of previous holders of the AC position.  (*See generally* Schaefer Supplemental Aff., ECF No. 41-8.)  It is clear from the record that the AC position in the Nursing Home Department experienced attrition over the four years prior to the hiring of Jackson.  (*Id.*)  Over the course of these four years, this single position was held by four different employees: Kelly Gresimer at $8.50 per hour; Tracy Roan at $8.25 per hour; Susan Etowski at $8.75 per hour; and Jody Fill on an "as needed" basis at an elevated pay rate of $12.00 per hour.  (*Id.* ¶¶ 3-6.)  Defendant states it:

- 16 -

> [u]sed Ms. Fill as the AC, prn, for over one year because, during that period of time, Grande Pointe had been experiencing difficulties hiring and retaining ACs in AL.  The replacement and retention problem was the result of the historically low AC salary, which was in the $8.00 range.  Therefore, shortly before Ms. Jackson was hired, Grande Pointe decided to increase the starting salary for the AC in AL in order to attract and retain a qualified candidate and remain competitive in the field.

(*Id.*; Schaefer Aff. ¶ 7.)

Plaintiff does not allege any facts to refute Defendant's allegations that the AC position was held by four different employees in four years.  Plaintiff does not refute that the most recent employee held the position for over a year on an "as needed" basis at an elevated pay rate of $12.00 per hour.  Rather, Plaintiff simply states that Defendant's affirmative defense "makes no sense" because he contends that Defendant did not lose Jackson's predecessor, Heather Bacik ("Bacik"), but promoted her.  (Pl's Opp'n, Pl.'s Decl. ¶ 15.)  Defendant states that Bacik was not an AC and was not Jackson's predecessor; rather, she was employed in social services.  (Schaefer Aff. ¶ 6.) Even assuming that Plaintiff's contention that Bacik was promoted from the AC position is correct, and drawing all justifiable inferences in his favor, this is still not evidence of the fact that Defendant did not base  its salary decision regarding Jackson on controlling attrition in the Assisted Living Department.

As in *Beck-Wilson*, the court finds that Defendant's interest in dealing with attrition problems by increasing the starting salary of the AC of the Assisted Living Department is a legitimate business factor other than sex.  Defendant has met its burden of proof on this first affirmative defense for the purposes of the EPA claim because no rational juror could find otherwise, and no genuine issue of material fact remains.

Second, Defendant asserts an affirmative defense that the wage differential between the AC and AL was partly due to the job candidates' respective salary histories, demands and willingness to negotiate.  Consideration of candidate's prior salary history is a factor as long as the employer "does not rely solely on prior salary to justify a pay disparity." *Balmer v. HCA*, 423 F.3d 606, 612 (6th Cir. 2005).  Differences in salary requests are also permissible "factor[s] other than sex" for the purposes of an EPA affirmative defense.  *See Balmer*, 423 F.3d at 612; *see also Weber v. Infinity Broadcasting Corp.*, No. 02-74602, 2005 U.S. Dist. LEXIS 40724, at *13 (E.D.Mich 2005) ("Negotiation is a permissible factor other than gender to consider in determining wages.").

Defendant states that the starting wage offered to Jackson was partly based on prior salary history.  (Def.'s Reply at 7.)  As evidence of Jackson's prior salary history, Grande Pointe points to Jackson's deposition where she stated that prior to working at Grande Point, she had earned between $10.00 and $11.50 per hour working for various prior employers.  (Jackson Dep. at 54-56, ECF No. 41-5.)  Plaintiff's previous salary is unknown.

However, there is a genuine issue regarding Plaintiff's salary demands and willingness to negotiate.  It is undisputed that Plaintiff listed $8.50 - $9.00 as a "minimum salary acceptable" on his application and that Jackson listed $10.00 (*cf.* Turner Application at 1, *with* Jackson Application at 1).  Additionally, Defendant contends that Jackson was clear during her interview that she was not willing to negotiate and would not accept less than $10.00.  (Rosenberg Aff. ¶ 3.) Defendant asserts Plaintiff, in contrast, "immediately accepted the position at the offered wage rate" and did not attempt to negotiate salary.  (Def.'s Mot. at 4, 8 ) (citing Turner Dep. at 40.)  However, Plaintiff claims that during the interview he asked for $10.00 per hour, but Defendant told him they could not pay more than $8.50 per hour.  (Turner Dep. at 17, 23.)  Therefore, Plaintiff has "come forward with

- 18 -

evidence demonstrating the existence of a triable issue of fact." *Timmer v. Michigan Dept. of Commerce*, 104 F.3d 833, 844 (6th Cir.1997). Defendant has therefore not proved its second affirmative defense of "factor[s] other than sex" because a genuine issue exists regarding Plaintiff's salary demands and his willingness to negotiate.  Since the court must view conflicting evidence in the light most favorable to Plaintiff, the court finds that Defendant cannot establish its second affirmative defense.

As discussed previously, however, the court finds that Defendant's interest in controlling attrition is a factor other than sex, and Defendant meets its burden of proof on this affirmative defense with such compelling evidence that no genuine issue of material fact remains.  Accordingly, Grande Pointe's Motion for Summary Judgment on Plaintiff's EPA claim is granted.

## B.  Reverse Gender Discrimination Relating to Unequal Pay.

Plaintiff also makes a claim of reverse gender discrimination relating to unequal pay under Ohio Revised Code §§ 4112.02 and 4112.99.  Section 4112.02(A) states, in pertinent part, that it shall be an unlawful discriminatory practice:

> For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Under Ohio law, the applicable evidentiary framework for discrimination cases is the same as that used in federal Title VII discrimination cases.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (applying the burden shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Furthermore, the Ohio Supreme Court has determined that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code, is

generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 192, 196 (Ohio 1981).

To establish a prima facie case of discrimination under O.R.C. § 4112.02, Plaintiff must show: "(1) that he was a member of a protected class; (2) that he sought and was qualified for an open position; (3) that despite his qualifications, he was denied the position; and (4) that an individual who is not a member of the protected class was given the position." *Bushman v. Mid-Ohio Regional Planning Comm.*, 107 Ohio App.3d 654, 662 (Franklin Cty. 1995) (applying the standard set forth in *McDonnell Douglas*).

However, when dealing with reverse discrimination, the first prong of the *McDonnell Douglas* framework is altered to allow a majority plaintiff to establish a *prima facie* case when "background circumstances must support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985). The remaining prongs are to be modified to reflect the requirement that the plaintiff demonstrate that he was "treated differently than other similarly situated employees who were not members of the protected group." *Id.* Therefore, the appropriate modified version of the *McDonnell Douglas* framework for a reverse discrimination case is that a plaintiff must show: "(1) background circumstances supporting the suspicion that the defendant is the unusual employer who discriminates against the majority; and (2) that the employer treated employees who were similarly situated, but not members of the protected group, more favorably." *Bushman*, 107 Ohio App.3d at 662; *see also Murray*, 770 F.2d at 67 (modifying the *McDonnell Douglas* framework to accommodate reverse discrimination).

Under *McDonnell Douglas*, once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. Once the defendant proffers a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate pretext. *Id.* at 804. A plaintiff can demonstrate pretext by showing, by a preponderance of the evidence, that the articulated reason: "(1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000); *See Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994).

### 1. Plaintiff's Prima Facie Claim.

For the following reasons, the court concludes that Plaintiff establishes a prima facie reverse gender discrimination claim relating to unequal pay under Ohio Revised Code §§ 4112.02 and 4112.99.

As stated previously, the first prong of establishing a prima facie case requires the Plaintiff to show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Bushman*, 107 Ohio App.3d at 662. The Sixth Circuit has not developed a bight line test for what constitutes "background circumstances" for the purposes of the first prong in a reverse discrimination case, but it looks to prior holdings for guidance. *Goller v. Ohio Dep't of Rehabilitation & Corrections*, No. 1:05cv2256, 2007 WL 1165799 at *4 (N.D. Ohio 2007).

Plaintiff relies on *Zambetti v. Cuyahoga Community College*, 314 F.3d 249 (6th Cir. 2002), (Pl.'s Opp'n at 14) to suggest that the "background circumstances" element is satisfied by the fact

that the majority of Grande Pointe's workforce and management, as well as all of the decision makers, are female.  The *Zambetti* court allowed the "background circumstances" prong to be satisfied by the fact that the decision maker was not a member of the protected group.  *See id.*, 314 F.3d at 257.  Following this precedent, the court finds that the fact that the majority of the workforce and management at Grande Pointe, as well as all of the decision makers in the instant claim, are female does "support the suspicion that the defendant is that unusual employer who discriminates against the majority."  Consequently, the first prong of the prima facie case is satisfied.

The second prong requires that the plaintiff show "that the employer treated employees who were similarly situated, but not members of the protected group, more favorably."  *Bushman*, 107 Ohio App.3d at 662.  Crucial to this prong is the establishment of a "similarly situated" comparator who is not a member of the protected group.  In *Mitchell*, the Sixth Circuit held that the employee with whom the plaintiff wishes to compare his treatment with must be "'similarly-situated *in all respects*.'"  *Mitchell*, 964 F.2d at 583 (quoting *Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir.1988)).  The Sixth Circuit has since clarified this to mean that the employee with whom the plaintiff wishes to compare his treatment with must be "nearly identical" in "all of the relevant aspects of his employment situation."  *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).  In determining what the relevant aspects are, courts are to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

When considering a gender-based wage discrimination case, the "relevant aspects" to be examined are the same as those examined when determining, for the purposes of an EPA claim, if

- 22 -

a plaintiff and comparator engage in "equal work." *See Conti v. Universal Enterprises, Inc.*, 50 Fed.Appx. 690, 699 (6th Cir. 2002). Therefore, the relevant factors to be examined are the "skill, effort, and responsibilities of each job and the working conditions under which each job is performed." *Id.*

Here, as in Plaintiff's EPA claim discussed previously, Plaintiff identified Jackson as a similarly situated female comparator. As the movant for summary judgment, the court previously established that Defendant failed to show that a reasonable juror could not find that Plaintiff established a prima facie EPA claim, and that Plaintiff therefore made a prima facie EPA claim. For the same reasons discussed previously in the context of a prima facie EPA claim, Plaintiff has identified Jackson, a similarly situated employee, not a member of the protected group, that Defendant has treated more favorably. Consequently, Plaintiff has established a prima facie case of reverse gender discrimination relating to unequal pay under O.R.C. §§ 4112.02.

<u>2. Plaintiff Cannot Show Defendant's Affirmative Defense is Pretext</u>.

Even though Plaintiff can establish the elements necessary for a prima facie case of reverse discrimination relating to unequal pay under §§ 4112.02 and 4112.99, Plaintiff's claim still fails because he cannot show Defendant's affirmative defense is pretext. As discussed previously in the context of the EPA claim, the court finds that Defendant's interest in controlling attrition in the Assisted Living Department is a factor other than sex, and Defendant met its burden of proof on this affirmative defense with such compelling evidence that no genuine issue of material fact remains.

Plaintiff has failed to produce any evidence, as required in the Sixth Circuit, showing that Defendant's proffered reason for the wage differential is pretext, i.e., that this reason either: "(1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) are

- 23 -

insufficient to warrant the challenged conduct." *Dews,* 231 F.3d at 1021; *see Manzer,* 29 F.3d at 1084.  In the absence of any such evidence from Plaintiff, no rational juror could find, even viewing it in the light most favorable to Plaintiff, that there is a genuine issue that Defendant's stated interest in controlling attrition in the Assisted Living Department is pretext.  Accordingly, the court grants Defendant's Motion on this claim.

### C. Plaintiff's Claim of Reverse Gender Discrimination Relating to Employment Opportunities under Ohio Revised Code §§ 4112.02, 4112.99

Plaintiff's last claim is reverse gender discrimination relating to employment opportunities under O.R.C. §§ 4112.02 and 4112.99.  Ohio Revised Code § 4112.02(A) states, in pertinent part, that, "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer, because of the . . . sex . . . of any person, . . . to . . . discriminate against that person with respect to hir[ing][.]"  As established previously, the applicable evidentiary framework for discrimination cases under § 4112.02 is the same as that used in federal Title VII discrimination cases.  *See Mitchell*, 964 F.2d at 582 (6th Cir. 1992) (applying the burden shifting framework from *McDonnell Douglas*, 411 U.S. at 802).  When analyzing reverse discrimination cases involving failure to promote claims, the applicable modified *McDonnell Douglas* framework is that a plaintiff must prove that: 1) "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority[;]" 2) he was qualified for the position he was seeking; 3) despite his qualifications, he was rejected; and 4) "the plaintiff was treated differently than other similarly situated employees who were not members of the protected group."  *Zambetti,* 314 F.3d at 255 (modifying the first and fourth prongs of the *McDonnell Douglas* framework to accommodate reverse discrimination in a failure to promote case).

Under *McDonnell Douglas*, once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802.  Once the defendant proffers a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate pretext.  *Id.* at 804.  A plaintiff can demonstrate pretext by showing, by a preponderance of the evidence, that the articulated reason: "(1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct."  *Dews,* 231 F.3d at 1021; *See Manzer,* 29 F.3d at 1084.

<u>1. Plaintiff's Prima Facie Case.</u>

Plaintiff has identified at least three examples where he feels he has been denied promotional opportunities: (1) the First Magnolia Opportunity; (2) the AAD Opportunity; and (3) the Second Magnolia Opportunity.  However, Plaintiff did not formally apply to the First or Second Magnolia Opportunity.  (Turner Decl. ¶¶ 10-11.)  In some instances, a plaintiff can establish a *prima facie* case even if he did not formally apply for the promotion.  *See Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145 (6th Cir.1989) (holding that where an employer creates an atmosphere of discrimination in which employees understand that applying for a position would be fruitless, lack of formally applying is not fatal).  However, Plaintiff has presented no evidence that such an atmosphere existed. Plaintiff merely stated that he felt discouraged because he was informed that there would be no increase in pay rate for the open positions.  (Turner Decl. ¶¶ 10-11.)  While Plaintiff alleges that this information was false, based on a belief that at least one of the women receiving the positions received a higher pay rate than him, Plaintiff has pointed to nothing in the record that suggests the new positions represented pay increases to the female employees who were hired.  The AAD

- 25 -

Opportunity, for which he was rejected and Phillips hired, was the only promotion Plaintiff actually applied for.  (Turner Decl. ¶¶ 10-13; Schaefer Aff. ¶ 25; Turnage Aff. ¶ 2-4.)  Thus, the AAD Opportunity will be the only promotional opportunity considered as support for Plaintiff's claim.

While the facts and circumstances surrounding this Ohio state law failure to promote claim are different than Plaintiff's Ohio state law unequal pay claim, the same "background circumstances" are present.  As we found previously, the fact that most of the workforce and management at Grande Pointe, as well as all of the decision makers in the instant claim, are female, does  "support the suspicion that the defendant is that unusual employer who discriminates against the majority," thereby satisfying the first prong necessary to establish a *prima facie* case.  *See Zambetti*, 314 F.3d at 257.

Plaintiff satisfies the third prong, inasmuch as he was considered for the promotion and rejected.  (Turnage Aff. ¶¶ 2-4.)   Plaintiff satisfies the fourth prong because he was treated "differently than other similarly situated employees who were not members of the protected group[,]" as evidenced by the fact that Phillips, a similarly situated female employee for the purposes of promotional consideration, was hired instead of Plaintiff.

However, a genuine issue of material fact exists regarding the second prong, whether Plaintiff was qualified for the position.  Grande Pointe states that Plaintiff was not qualified for the position because he refused to take  a computer proficiency test and therefor failed to complete the interview.  (Turnage Aff. ¶ 3; Schaefer Aff. ¶ 25.)  Turnage states that Plaintiff's refusal to take part in the computer test demonstrated to her that Plaintiff either "could not or would not demonstrate his computer skills or proficiency."  (Turnage Aff. ¶ 3.)  Plaintiff denies that he was asked to take a computer proficiency test, let alone that he refused to do so.  (Turner Decl. ¶ 12.)  Consequently,

- 26 -

there is a material issue regarding whether Turner was qualified for the position.  (Schaefer Aff. ¶ 25.)

When reviewing summary judgment motions, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Plant v. Morton Intern., Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).  Consequently, accepting Plaintiff's statement that he was never asked to take a computer test as true, reasonable jurors could find that Plaintiff was in fact qualified.  Therefore, Plaintiff has established his prima facie case of failure to promote due to reverse gender discrimination.

<u>2. Genuine Issues of Material Fact Preclude Summary Judgment</u>.

Once Plaintiff has established a prima facie case, the burden of production shifts to Grande Pointe to articulate a legitimate, non-discriminatory reason for the alleged adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802. Grande Pointe has stated that its reason for hiring Phillips instead of Plaintiff, aside from the fact that Plaintiff did not take a required computer proficiency test, is that Plaintiff behaved "in a very unprofessional manner" during his interview. (Turnage Aff. ¶ 3.) According to Turnage, Plaintiff "sprawled in the chair and did not appear to take the interview very seriously." (*Id.*)  When Turnage asked if Plaintiff had any questions, Plaintiff responded, "No, this job will be easier than what I am doing now." (*Id.*)  After having been informed that the AAD Opportunity would "involve much more responsibility and be very different[,]" Plaintiff was asked, and he refused, to take a computer proficiency test.  (*Id.*)

Once Defendant articulates its legitimate, non-discriminatory reasons, the burden shifts back to Plaintiff to prove, by a preponderance of the evidence, that Grande Pointe's articulated reasons are a pretext for discrimination.  *McDonnell Douglas*, 411 U.S. at 804.  Plaintiff has attempted to

demonstrate pretext by showing that the articulated reason "has no basis in fact." *Dews,* 231 F.3d at 1021; *see Manzer,* 29 F.3d at 1084.  In support of his contention, Plaintiff has submitted a declaration that denies that he behaved unprofessionally during the interview.  (Turner Decl. ¶ 12.) Specifically, it states that he "acted in a professional manner" and did not "slouch in [his] chair or state that the job would be easier than [his] current one."  (*Id.*)  Further, it states he did not refuse, nor was he asked, to take a computer proficiency test.  (*Id.*)  Again, Grande Pointe's and Plaintiff's assertions are mutually exclusive and this court is required to believe Plaintiff's statements "and all justifiable inferences are to be drawn in his favor."  *Plant*, 212 F.3d at 934 (quoting *Liberty Lobby*, 477 U.S. at 256).

Looking at the evidence in the light most favorable to the non-moving party and drawing all "justifiable inferences . . . in his favor," reasonable jurors could find that Grande Pointe's articulated reasons have "no basis in fact" and are therefore a pretext for reverse gender discrimination.  Thus, genuine issues of material fact exist as to whether Plaintiff refused, or was even asked, to take a computer proficiency test by Grande Pointe, and whether Plaintiff behaved unprofessionally in the manner in which Grande Pointe describes.  The existence of this genuine issue of material fact precludes summary judgment on Plaintiff's failure to promote claim based on reverse gender discrimination.

### IV.  CONCLUSION

For the above-stated reasons, Defendants' Motion for Summary Judgment (ECF No. 35) is granted in part and denied in part as follows:

Summary judgment is granted in favor of Grande Pointe on Plaintiff's claim, alleging a violation of the Equal Pay Act relating to gender-based pay discrimination under 29 U.S.C. §§ 201-209.

Summary judgment is granted in favor of Grande Pointe on Plaintiff's claim, alleging reverse gender discrimination relating to unequal pay under O.R.C. §§ 4112.02 and 4112.99.

Grande Pointe's Motion for Summary Judgement on Plaintiff's claim, alleging reverse gender discrimination relating to employment opportunities under O.R.C. §§ 4112.02 and 4112.99 is denied as genuine issues of material fact are in dispute that preclude summary judgment.

The court will hold a final pretrial conference in this case on October 17, 2007, at 12:00 p.m. Trial shall commence on November 13, 2007, at 9:00 a.m.  A separate trial order shall issue.

IT IS SO ORDERED.


/s/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE


September 10, 2007

- 29 -